# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF MICHIGAN

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

Plaintiff,

v.

THE BAY MILLS INDIAN COMMUNITY,

Defendant.

Case No.  1:10-cv-01278-PLM

Honorable Chief Judge Paul L. Maloney
District Judge

## BRIEF OF BAY MILLS INDIAN COMMUNITY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF ISSUE PRESENTED ............................................................... ix

CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT ............. x

I.      INTRODUCTION ...................................................................................... 1

II.     MATERIAL PROCEEDINGS AND FACTS ............................................ 2

    A.      BMIC Lawsuit Under Indian Claims Commission Act. ........................... 2

    B.      The Michigan Indian Land Claims Settlement Act. ................................. 3

    C.      The Indian Gaming Regulatory Act. ........................................................ 5

    D.      The Tribal/State Compact. ....................................................................... 5

    E.      The Vanderbilt Parcel. ............................................................................. 6

III.    STANDARD OF REVIEW ....................................................................... 6

IV.     ARGUMENTd7

    A.      Plaintiff Has Failed To Show Likelihood Of Success On The Merits. .................... 7

        i.      Plaintiff Lacks Standing. ................................................................. 7

        ii.     Plaintiff's Jurisdiction to Sue Is Inconsistent with its Substantive Argument. ............................................................................... 8

        iii.    Plaintiff Failed To Demonstrate That IGRA Prohibits Gaming On Vanderbilt Property. ........................................................... 9

            a.      IGRA Permits BMIC to Conduct Gaming on Vanderbilt Property. 9

                1.      Land Purchased Using MILCSA Funds Are Restricted Fee Lands and, therefore, "Indian Lands" under IGRA and Bay Mills Compact. ............................................................ 9

                    (i)     If Congress Meant Fee Simple, Congress would have said Fee Simple. ........................................... 10

                    (ii)    Land Acquired with MILCSA Funds is Held in Restricted Fee. ....................................................... 11

                2.      IGRA Does Not Restrict Gaming on Restricted Fee Land. 13

b. The Vanderbilt Parcel Was Acquired Pursuant to MILCSA. .........16

 1. BMIC Acquired the Vanderbilt Parcel Using MILCSA Trust Funds. .................................................................16

 2. Congress Intended a Broad Grant of Authority for BMIC to Use Trust Funds to Acquire Landholdings to Benefit the Tribe. ................................................................................17

c. BMIC has Jurisdiction and Exercises Governmental Authority....20

 1. BMIC Has Jurisdiction. ...................................................20

 2. BMIC Exercises Governmental Authority........................22

B. Plaintiff Cannot Demonstrate Irreparable Injury. ...................................................23

i. Plaintiff Fails to Demonstrate Irreparable Harm as a Matter of Law. .......24

ii.. Plaintiff Has Failed to Demonstrate Facts that Establish Irreparable Harm. ....................................................................................................25

C. BMIC, Its Members, And Casino Employees Will Suffer Irreparable Harm If An Unwarranted Injunction Is Issued. ..........................................................................27

D. The Public Interest Would Be Harmed By An Injunction. ....................................29

V. CONCLUSION....................................................................................................30

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska v. Native Village of Venetie Tribal Government*,
   522 U.S. 520 (1998)............................................................................20, 21

*Albuquerque Indian Rights v. Lujan,*
   930 F.2d 49, 59 (D.C. Cir. 1991).........................................................14

*Alonzo v. United States*, 249 F.2d 189, 196 (10th Cir. 1957) ........................................12

*Amoco Production Co. v. Village of Gambell, Alaska*,
   480 U.S. 531 (1987).........................................................................27

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy*,
   548 U.S. 291 (2006).........................................................................13

*Artichoke Joe's California Grand Casino v. Norton*,
   353 F.3d 712 (9th Cir.2003) ..............................................................11

*Barber ex rel. Barber v. Dearborn Public Schools*,
   286 F. Supp. 2d 847 (E.D. Mich. 2003)..................................................28, 29

*Bay Mills Indian Community v. Little Traverse Bay Bands of Odawa Indians*,
   No. 5:99-cv-88 (W.D. Mich. 1999) ......................................................8, 9

*Buzzard v. Oklahoma Tax Comm'n*,
   992 F.2d 1073 (10th Cir. 1993) .........................................................20, 21

*Caminetti v. United States*,
   242 U.S. 470 (1917)........................................................................13

*Cheyenne River Sioux Tribe v. State of South Dakota*,
   830 F. Supp. 523 (D.S.D. 1993), aff'd, 3 F.3d 273 (8th Cir. 1993).......................23

*County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*,
   502 U.S. 251 (1992).......................................................................11

*De Sylva v. Ballentine*,
   351 U.S. 570 (1956).......................................................................18

*Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18,
   International Typographical Union*,
   471 F.2d 872 (6th Cir. 1972) ............................................................28

*Duncan v. Walker*,
    533 U.S. 167 (2001) ................................................................................................10

*Empire Healthchoice Assurance, Inc. v. McVeigh*,
    547 U.S. 677 (2006) ..................................................................................................8

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
    545 U.S. 546 (2005) ..................................................................................................8

*Friendship Materials, Inc. v. Michigan Brick, Inc.*,
    679 F.2d 100 (6th Cir. 1982) ...................................................................................24

*Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney*,
    369 F.3d 960 (6th Cir. 2004) ............................................................................14, 25

*Hoover Transp. Serv. Inc., v. Frye*,
    77 Fed. Appx. 776 (6th Cir. 2003) ..........................................................................25

*Indian Country U.S.A., Inc. v. State of Oklahoma*,
    829 F.2d 967 (10th Cir. 1987) .................................................................................20

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ...............................................................................20

*Keweenaw Bay Indian Cmty v. United States*,
    1999 WL 33978509 ..................................................................................................30

*Leary v. Daeschner*,
    228 F.3d 729 (6th Cir. 2000) ............................................................................. 6, ix

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).............................................................................................ix, 7

*Menominee Tribe of Indians v. United States*,
    391 U.S. 404 (1968).................................................................................................11

*Mercy Health Servs. v. 1199 Health & Human Serv. Employees Union*,
    888 F. Supp. 828 (W.D. Mich. 1995) ................................................................23, 25

*Merrion v. Jicarilla Apache Tribe*,
    455 U.S. 130 (1982).................................................................................................11

*Miami Tribe of Oklahoma v. United States*,
    927 F. Supp. 1419 (D. Kan. 1996)...........................................................................20

*Michigan Bell Tel. Co. v. MFS Intelenet of Michigan Inc.*,
    16 F. Supp. 2d 828 (W.D. Mich. 1998) ...................................................................25

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*,
   945 F.2d 150 (6th Cir. 1991) .................................................................24

*Montana v. Blackfeet Tribe*,
   471 U.S. 759 (1985)................................................................... ix, 11

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)...........................................................................7

*Overstreet v. Lexington-Fayette Urban County Gov't*,
   305 F.3d 566 (6th Cir. 2002) ................................................ ix, 6, 7, 30

*Ramah Navajo Chapter v. Lujan*,
   112 F.3d 1455 (10th Cir. 1997) ...........................................................14

*Sault Ste. Marie Tribe of Chippewa Indians v. United States*,
   288 F.3d 910 (6th Cir. 2002) ...............................................................8

*Sault Ste. Marie Tribe of Chippewa Indians v. United States*,
   576 F. Supp. 2d 838 (W.D. Mich. 2008) ......................................11, 14

*South Dakota v. Yankton Sioux Tribe*,
   522 U.S. 329 (1998).........................................................................20

*State of Rhode Island v. Narragansett Indian Tribe*,
   19 F.3d 685 (1st Cir. 1994)...............................................................22

*United States v. McGowan*,
   302 U.S. 535 (1938).....................................................................20, 21

*United States v. Moore*,
   613 F.2d 1029 (D.C. Cir. 1979) .....................................................18, 19

*United States v. Pelican*,
   232 U.S. 442 (1914)........................................................................20

*United States v. Ron Pair Enter., Inc.*,
   489 U.S. 235 (1989)....................................................................10, 13

*United States v. Sandoval*,
   231 U.S. 28 (1913)......................................................................20, 21

*United States v. Washington*,
   584 F.3d 693 (6th Cir. 2009) .............................................................13

*Walker v. Bain*,
   257 F.3d 660 (6th Cir. 2001) .............................................................10

**REGULATIONS**

25 C.F.R. 152.22 ...................................................................................22

25 C.F.R Part 151 ..................................................................................3

25 C.F.R. Part 151 and ........................................................................15

57 Fed. Reg. 12382 (1992) ...................................................................22

73 Fed. Reg. 29,355–56 (May 20, 2008) .............................................15

**TREATISES**

Restatement (Third) of Trusts § 80 (2007) ...........................................16

Restatement (Third) of Trusts § 86 (2007) ...........................................17

Restatement (Third) of Trusts § 87 (2007) ...........................................16

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. III, § 2 ...................................................................... 7, ix

**STATUTES**

7 Stat. 207 .............................................................................................2

7 Stat. 491 .............................................................................................2

10 Stat. 1064 .......................................................................................11

11 Stat. 621 ...........................................................................................2

18 U.S.C. § 1151 .................................................................................20

25 U.S.C. § 81(a)(1) ............................................................................10

25 U.S.C. § 2702(1) ..............................................................................5

25 U.S.C. § 2703 ............................................................................14, 16

25 U.S.C. § 2703(4) ................................................................................................5, 14

25 U.S.C. § 2710(d)(1) .................................................................................................5

25 U.S.C. §§ 2710(d)(1) and (2) ..................................................................................6

25 U.S.C. §§ 2710(d)(1)(c), (d)(3) ..............................................................................5

25 U.S.C. § 2710(d)(7)(A) ............................................................................................8

25 U.S.C. § 2719 ............................................................................13, 14, 15, 16

Abandoned Shipwreck Act of 1987, 43 U.S.C. § 2102(c) .......................................10

Archaeological Resources Protection Act of 1979, 16 U.S.C. § 470b(b)(4) ...............10

Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1702(3) ............10

Indian Claims Commission Act of 1946, 25 U.S.C. § 70 *et seq.* ................................2

Indian Gaming Regulatory Act, 25 U.S.C. §2701, et seq. ....................................... ix, 1

Indian Health Amendments of 1992, 25 U.S.C. § 1680n(b) .......................................10

Indian Trade and Intercourse Act, 25 U.S.C. §177 .............................................21, 22

Indian Tribal Judgment Funds Act of 1983, 25 U.S.C. § 1401 *et seq.* ...........................2

Michigan Indian Land Claims Settlement Act, Pub. L. 105-143 ..................................1

Michigan Land Claim Settlement Act of 1997, Pub. L. 105-143, 111 Stat. 2652 (Dec. 15, 1997) ...................................................................................................... ix, 4

National Community Service Act of 1990, 42 U.S.C. § 12511(10) ............................10

Native American Business Development, Trade Promotion and Tourism Act of 2000, 25 U.S.C. § 4302(4) ..................................................................................................10

Paiute Indians of Utah Restoration Act, 25 U.S.C. § 766 ...........................................11

Pub. L. 105-143, § 107(a)(2) ......................................................................................16

Pub. L. 105-143, § 107(a)(3) ................................................................13, 16, 17, 18

The Uniform Trust Code § 814(a) ...............................................................................17

**OTHER AUTHORITIES**

Federal Practice and Procedure ........................................................................................28

H.R. 1604 .........................................................................................................................3

H.R. Rep. No. 602-632 ....................................................................................................13

SUTHERLAND STATUTORY CONSTRUCTION, §46.6 at 230 .............................................10

*United States Indian Claims Commission Final Report* (1978) at 26-27, 65 .................2

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (9th ed. 1983) ................................19

## <u>STATEMENT OF ISSUE PRESENTED</u>

Plaintiff seeks a preliminary injunction based upon an interpretation of federal law that is inconsistent with the plain language of that law and the underlying statutory purpose of assisting the Bay Mills Indian Community to acquire land for the betterment of the Tribe.  Plaintiff submits no evidence to support its interpretation of the law and submits no evidence that Plaintiff has suffered actual harm.  Should this Court enjoin the Bay Mills Indian Community from gaming lawfully pursuant to federal law and its Tribal-State Compact where Plaintiff has not shown a likelihood of success on the merits with regard to its underlying claims and similarly cannot satisfy the other standards for issuance of a preliminary injunction?

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

CASES

*Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir 2002)

*Leary v. Daeschner,* 228 F.3d 729, 736, 739 (6th Cir. 2000)

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)

*Montana v. Blackfeet Tribe,* 471 U.S. 759, 766 (1985)

STATUTES

U.S. Const. art III, § 2

Indian Gaming Regulatory Act, 25 U.S.C. §2701, et seq.

Michigan Land Claim Settlement Act of 1997, Pub. L. 105-143, 111 Stat. 2652 (Dec. 15, 1997)

## I.    INTRODUCTION

Plaintiff Little Traverse Bay Bands of Odawa Indians ("Plaintiff") seeks to enjoin the Bay Mills Indian Community ("BMIC" or "Tribe") from lawfully operating a casino on restricted fee land owned by BMIC on which casino gaming is permitted pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.,* the Michigan Indian Land Claims Settlement Act, Pub. L. 105-143 ("MILCSA"), and the August 20, 1993 Gaming Compact between BMIC and the State of Michigan ("Bay Mills Compact").

By operation of law, land BMIC acquires pursuant to MILCSA becomes restricted fee land subject to BMIC's jurisdiction.  Because such land constitutes "Indian lands", as defined by both IGRA and the Bay Mills Compact, gaming on the Vanderbilt parcel is permitted.  Plaintiff argues otherwise based on a strained interpretation of MILCSA that would render statutory language meaningless, misunderstands the relevant legislative history, and ignores that, as a remedial statute enacted for the benefit of an Indian tribe, ambiguities must be resolved in favor of BMIC.  (The supplemental authority relied upon by Plaintiff, a memorandum by the Solicitor of the Department of Interior suffers from identical flaws – and also depends on an inaccurate belief of how the MILCSA language came to be.)  Plaintiff fails to articulate an argument on the merits sufficient to defeat a summary judgment motion, let alone sufficient to obtain the extreme remedy of preliminary injunctive relief.

Plaintiff's argument concerning the remaining factors for injunctive relief is similarly inadequate.  Although Plaintiff sounds false alarms that "explosive proliferation of off-reservation casinos in Michigan and elsewhere" will occur unless a preliminary injunction is issued, Congress's unique treatment of land acquired by BMIC under MILCSA permits casino gaming on property BMIC acquires using MILCSA funds, but does not open Pandora's box for similar acquisitions.  Furthermore, Plaintiff has offered no evidence that BMIC's Vanderbilt

casino has actually caused any concrete or particularized injury, and fails to establish a likelihood of irreparable injury. To the contrary, it is BMIC and its members, Vanderbilt, and employees of BMIC's casino, that would be injured if the Court enjoins BMIC's lawful enterprise. Simply put, Plaintiff does not satisfy its heavy burden of establishing a right to a preliminary injunction.

## II.     MATERIAL PROCEEDINGS AND FACTS

### A.    BMIC Lawsuit Under Indian Claims Commission Act.

Years ago, BMIC sought compensation under the Indian Claims Commission Act of 1946, 25 U.S.C. § 70 *et seq.,* because the Tribe had been inadequately compensated for land ceded in the Treaty of March 28, 1836 (7 Stat. 491) [Docket 18-E] and the Treaty of August 2, 1855 (11 Stat. 621) [Docket 18-R]. These claims were consolidated with claims under the Treaty of July 6, 1820 (7 Stat. 207) [Docket No. 58] and the Treaty of July 31, 1855 (11 Stat. 621) [Docket 364], ultimately resulting in judgments for BMIC. *United States Indian Claims Commission Final Report*, (1978) at 26-27, 65. Congress appropriated the funds to pay the judgment awards in the 1970s, but no disbursement occurred thereafter.

After waiting more than twenty-five years to receive the funds, in 1996, BMIC sued the Department of Interior over Interior's failure to facilitate distribution as required by the Indian Tribal Judgment Funds Act of 1983, 25 U.S.C. § 1401 *et seq.* BMIC and the Secretary of Interior then agreed to entry of an order requiring the development of proposed legislation to distribute the awards. BMIC Exhibit A. By March 19, 1997, Interior had drafted legislation and the Office and Management and Budget had transmitted it to the Congress for consideration and passage. BMIC Exhibit B. On April 16, 1997, the Court, therefore, entered an order dismissing BMIC's case against the Federal government. BMIC Exhibit C.

**B.      The Michigan Indian Land Claims Settlement Act.**

Interior's draft legislation did not include plans for any tribe's share of the judgment funds, rather the initial plan for distribution of BMIC's share is the result of BMIC's extensive consultation with Congressional staff, and is found in sec. 7 of H.R. 1604, as introduced May 14, 1997.  Subsection 7(a) establishes the Land Trust, and subsection 7(a)(3) of that initial version would have directed that lands acquired by BMIC with Land Trust earnings "shall be held in trust by the United States for the Bay Mills Indian Community."  BMIC Exhibit D.  Throughout the process of developing MILCSA and the Land Trust provisions, BMIC officials were deeply involved in the crafting of the language, consulting with Congress as amendments were proposed and considered.  Decl. Of Jeffrey Parker, BMIC Exhibit E, ¶¶13-18.

Following an initial hearing, the House Committee on July 15, 1997, received proposed "technical amendments" from Interior.  Plaintiff's Exhibit 11.  Interior suggested that the provision regarding BMIC's Land Trust, stating that "[a]ny land so acquired shall be held in trust by the United States for the Bay Mills Indian Community," "should be clarified that the Secretary retains discretion under existing regulations (25 C.F.R Part 151) and that this section does not repeal the limitations in section 20 of the Indian Gaming Regulatory Act."  While the Committee did not modify the BMIC Land Trust in its first substitute bill, over the next months, the Committee prepared a floor amendment.  This version, again drafted in consultation with BMIC, modified Section 7(a)(3) as follows:

> The earnings generated by the Land Trust shall be used ~~annually and~~ exclusively for <u>improvements on tribal land or</u> the consolidation and enhancement of tribal landholdings through purchase or exchange.  Any land ~~so~~ acquired <u>with funds from the Land Trust</u> shall be held <u>as Indian lands are held.</u>~~in trust by the United States for the Bay Mills Indian Community.~~

BMIC Exhibit F.

3

At the same time, the Senate Committee on Indian Affairs was also considering the bill, even though the measure had yet to pass the House.  Again, Interior provided comments in addition to its prepared testimony, in correspondence addressed to Senate Committee Chairman Ben Nighthorse Campbell, this time suggesting that the last sentence of § 7(a)(3) be deleted as unnecessary.  BMIC Exhibit G.  The signed and dated version of this correspondence is labeled Plaintiff's Exhibit 12, and it is noted that the letter's date (November 12, 1997) is subsequent to the date of the Senate floor vote on November 9, 1997.  Interior, however, is completely wrong in today assuming that this suggestion was not made known to anyone outside the Department prior to the signing date, and that the letter should be viewed as some form of contemporaneous explanation of the meaning of Section 7(a)(3).  Actually, a draft copy of that letter was sent to BMIC for review with Congressional staff before the Senate acted.  Decl. of Jeffrey Parker, BMIC Exhibit E, ¶¶17-18.  As can be seen in the document, there are notations in the margins reflecting discussion between BMIC and Congress.  BMIC Exhibit H.  A review of MILCSA reveals that suggestions bearing notations indicating agreement by BMIC and Congress correspond with the final text of MILCSA, while those for which disagreement is noted are not found in the final text.  *See* BMIC Exhibit H and BMIC Exhibit I.  BMIC strongly objected to the suggestion that the last sentence of § 7(a)(3) be deleted and discussed that position with Congressional staff.  Decl. of Jeffrey Parker, BMIC Exhibit E, ¶18.  There can be no doubt that Interior's suggestion to delete the "held as Indian lands are held" language as unnecessary was considered and rejected by the Senate.  Ultimately, the bill was passed with the phrase "held as Indian lands are held" included, signed by the President on December 15, 1997, and became Pub. L. 105-143, 111 Stat. 2652.  BMIC Exhibit I.

**C.      The Indian Gaming Regulatory Act.**

Congress passed IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  Under IGRA, a tribe may conduct Class III Gaming on "Indian Lands."  25 U.S.C. § 2710(d)(1).[1]

IGRA requires a Tribe to adopt a gaming ordinance and requires that ordinance to be approved by the National Indian Gaming Commission ("NIGC").  On September 15, 2010, the NIGC approved the most recent amendment to the BMIC Gaming Ordinance.  *See* BMIC Exhibit J.  On October 29, 2010, the Bay Mills Indian Community Tribal Gaming Commission issued BMIC a Class III Facility Gaming License for Bay Mills Resort & Casino-Vanderbilt, 8733 Old 27 North, Gaylord, Michigan 49735, which is the mailing address for the property acquired in Vanderbilt.  BMIC Exhibit K.

**D.      The Tribal/State Compact.**

To engage in Class III Gaming, a tribe must entire into a compact with the state, setting forth the terms and conditions for Class III gaming.  25 U.S.C. §§ 2710(d)(1)(c), (d)(3).  BMIC and the State of Michigan are party to the Bay Mills Compact, which was published by the Secretary of Interior in the Federal Register on November 30, 1993.  Plaintiff's Exhibit 2.  BMIC operates its existing Class III gaming facilities in compliance with the terms of its Compact and

---

[1] IGRA Section § 2703(4) defines "Indian Lands" as:

(A)  all lands within the limits of any Indian reservation, and

(B)  any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power. 25 U.S.C. § 2703(4).

with the provisions of the BMIC Gaming Ordinance, which must be approved by the National Indian Gaming Commission under § 11(d) of IGRA, 25 U.S.C. §§ 2710(d)(1) and (2).

Pursuant to Section 3 of the Bay Mills Compact, BMIC may operate multiple Class III gaming facilities as long as those facilities are located on "Indian Lands," which the Compact defines as, among other things, "any lands title to which is either held in trust by the United States for the benefit of the Tribe or individual or held by the Tribe or individual subject to restriction by the United States against alienation and over which the Tribe exercises governmental power."  Bay Mills Compact, Section 2(B), Plaintiff's Exhibit 2.

**E.     The Vanderbilt Parcel.**

On August 27, 2010, BMIC acquired approximately 46 acres in the Village of Vanderbilt in Otsego County, Michigan, with funds derived solely from the earnings of the Land Trust, as verified by the Tribe's outside auditing firm.  BMIC Exhibit L.  Because that land was purchased pursuant to MILCSA using Land Trust Funds, the land is subject to restriction by the United States against alienation.    Additionally, as discussed further below, the Tribe exercises governmental power over the parcel.  On November 3, 2010, BMIC opened the facility known as Bay Mills Resort & Casinos, Vanderbilt.

## III.         STANDARD OF REVIEW

A court is to consider four factors in addressing a motion for a preliminary injunction: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunctions."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)).

The extraordinary remedy of a preliminary injunction bears a heavy evidentiary burden. *Overstreet*, 305 F.3d at 573 ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it.").   The Sixth Circuit also has compared the burden of proof necessary for a preliminary injunction to the burden of proof for summary judgment, stating that "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Plaintiff cannot satisfy the burden of establishing any of the necessary four elements.

## IV.        ARGUMENT

**A.     Plaintiff Has Failed To Show Likelihood Of Success On The Merits.**

### i.     Plaintiff Lacks Standing.

Article III of the Constitution limits federal judicial jurisdiction to actual "cases" and "controversies."  U.S. Const. art. III, § 2; *see also O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974).  Absent an actual case or controversy, a plaintiff lacks standing.  In this case, Plaintiff has provided no evidence of an articulable injury and, therefore, lacks standing.

The United States Supreme Court has rejected the notion that Congress may confer standing through statute in a manner that exempts a plaintiff from proving an articulable injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  *Lujan* developed a three-part test for standing.  *Id*.  First, the plaintiff must suffer an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Id.* at 560.  Second, there must be causation - the injury has to be "fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party."  *Id*.  Third, it must be "likely," not "speculative," that the injury will be "redressed by a favorable decision."  *Id*. at 561.  Plaintiff bears the burden of

demonstrating these elements. *See Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910, 916 (6th Cir. 2002) ("[i]f the operation of the Petoskey casino had in fact been draining trade from St. Ignace, it should not have been beyond the Sault Tribe's capability to present facts and figures demonstrating and quantifying the diversion of business. Perhaps the Sault Tribe failed to make such a presentation because the evidence simply was not there.").

As further outlined below in addressing Plaintiff's lack of irreparable harm, Plaintiff has utterly failed to submit one shred of evidence to support that it has yet suffered actual harm as a result of BMIC's opening a casino in Vanderbilt. Plaintiff bears the burden of demonstrating that it has suffered a concrete and particularized injury that is neither conjectural or hypothetical and that the injury was caused by the BMIC. Plaintiff has failed to meet this burden and this case must, therefore, be dismissed. (And consequently, Plaintiff is unlikely to succeed on the merits.)

### ii.    Plaintiff's Jurisdiction to Sue Is Inconsistent with its Substantive Argument.

This Court is a court of limited jurisdiction. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006). It exercises only that authority granted it by the Constitution and by statute. *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005). Plaintiff alleges jurisdiction based on IGRA's provision allowing one tribe to sue another tribe for gaming on "Indian Lands" in violation of IGRA, and relies solely on this provision as both its statutory authority to abrogate BMIC's immunity from suit and as the basis to enjoin BMIC from conducting class III gaming.[2] Pl.'s Br. 5. That is the only basis for jurisdiction that would allow

---

[2] Section 2710(d)(7)(A) provides that the district courts shall have jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity **located on Indian lands** and conducted in violation of any Tribal-State compact…". 25 U.S.C. § 2710(d)(7)(A) (emphasis added).

this lawsuit.  So, either BMIC is operating on "Indian Lands" and this court has jurisdiction to hear this case or BMIC is not operating on "Indian Lands" and this court lacks jurisdiction.

Plaintiff cites the previous litigation between the parties in *Bay Mills Indian Community v. Little Traverse Bay Bands of Odawa Indians*, No. 5:99-cv-88 (W.D. Mich. 1999).  There, a tribe sought to operate a class III gaming facility on "Indian lands" that were not held in trust. *Bay Mills Indian Community*, No 5:99-cv-88, slip op. at 7.  Operating its gaming facility under such circumstances directly violated Little Traverse's compact, which requires Little Traverse's gaming facility to be located on "Eligible Indian Lands" and defining "Eligible Indian Lands" as necessarily being both reservation and held in trust.  *Id.* at 3.  Because, however, the definition in its compact is narrower than that of "Indian Lands" as defined by IGRA, the court retained jurisdiction based upon Plaintiff's claims that the land remained a reservation.  *Id.* at 8.  The facts in the present case are fundamentally different.  The Bay Mills Compact's definition of Indian Lands eligible for licensure is virtually identical to IGRA's definition of Indian Lands.  As such, the Vanderbilt casino either is located on Indian Land and this Court has jurisdiction, or, it is not located on Indian Land and this Court lacks jurisdiction.

### iii. Plaintiff Failed To Demonstrate That IGRA Prohibits Gaming On Vanderbilt Property.

#### a. IGRA Permits BMIC to Conduct Gaming on Vanderbilt Property.

##### 1. Land Purchased Using MILCSA Funds Are Restricted Fee Lands and, therefore, "Indian Lands" under IGRA and Bay Mills Compact.

A central issue in this case is whether the Vanderbilt parcel constitutes "Indian Lands." An important component of that determination is whether the land is trust land, restricted fee, or fee simple.  The parties agree that the land is not intended to be trust land.  The term "Indian lands" appears in a number of federal statutes, most of which contain a description of the

ownership interests included within the definition of the term.[3]  Taken as a whole, the definitions employed by Congress for "Indian lands" reference the special status accorded land held by Indian tribes, including reservation land, trust land, and land held in restricted fee.  The plain language of MILCSA, in the context of Congress's intent, must be analyzed to determine whether the Vanderbilt parcel is restricted fee or fee simple.

### (i)    If Congress Meant Fee Simple, Congress would have said Fee Simple.

If Congress intended the phrase "held as Indian lands are held" to mean that BMIC simply would hold land purchased with MILCSA funds as fee simple, Congress could have said nothing or "held as fee simple."[4]  The phrase "held as Indian lands are held," however, must have meaning and must mean something other than that the lands are held in fee simple by BMIC.

Plaintiff's argument that Congress intended "as Indian lands are held" to mean "fee simple" ignores common sense and the basic rules of statutory construction.  Two principles of statutory construction compel the rejection of Plaintiff's interpretation.  First, every word in a statute is presumed to have meaning, and any interpretation which renders words superfluous or redundant must be rejected.  *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001).  Second, the so-

---

[3] Archaeological Resources Protection Act of 1979, 16 U.S.C. § 470b(b)(4); McKinney-Vento Homeless Assistance Act, 20 U.S.C. § 7713(7); Indian Tribal Economic Development and Contract Encouragement Act of 2000, 25 U.S.C. § 81(a)(1); Indian Health Amendments of 1992, 25 U.S.C. § 1680n(b); Native American Business Development, Trade Promotion and Tourism Act of 2000, 25 U.S.C. § 4302(4);  Indian Gaming Regulatory Act, 25 U.S.C. § 2703(4); Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1291; Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1702(3); National Community Service Act of 1990, 42 U.S.C. § 12511(10); Abandoned Shipwreck Act of 1987, 43 U.S.C. § 2102(c).

[4] An elementary rule of construction is that a court must give effect, where possible, to every clause and word of a statute.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001); SUTHERLAND STATUTORY CONSTRUCTION, §46.6 at 230.  The starting point for that exercise is the plain language of the statute itself. *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989).

10

called *Blackfeet* presumption requires statutes to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit. *Sault Ste. Marie Tribe of Chippewa Indians v. United States,*, 576 F. Supp. 2d 838, 848—49 (W.D. Mich. 2008); *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 268-69 (1992) ("[w]hen we are faced with . . . two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'") (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).[5]  With those principles in mind, it must be concluded that Congress intended to say what it said.

Second, Plaintiff's contention, based on the Interior memorandum submitted as supplemental authority, that the phrase "held as Indian lands are held" has no meaning and was unnecessary is undone by the fact that when Interior proposed deleting the phrase as unnecessary, Congress, after consulting with BMIC, rejected this suggestion.  This fact further demonstrates that the phrase must have meaning.

### (ii)    Land Acquired with MILCSA Funds is Held in Restricted Fee.

Although the phrase "held as Indian lands are held" has been utilized in treaties and statutes to set aside lands for tribal use and occupancy and thereby construed as a reservation,[6]

---

[5] Federal courts have outlined what is commonly known as the Indian canon of construction or the *Blackfeet* presumption.  As the Ninth Circuit has explained, "[t]he *Blackfeet* presumption simply requires that, when there is doubt as to the proper interpretation of an ambiguous provision in a federal statute enacted for the benefit of an Indian tribe, "the doubt [will] benefit the Tribe, for `[a]mbiguities in federal law have been construed generously in order to comport with  .  .  .  traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 729 (9th Cir.2003) (quoting *Merrion v.  Jicarilla Apache Tribe*, 455 U.S.  130, 152 (1982)).

[6] *See, e.g.*, *Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968), establishing the reservation under the Treaty of Wolf River, May 12, 1854 (10 Stat. 1064); Paiute

the reading more consistent with the language of MILCSA and relevant precedent is that land BMIC acquires thereunder is held in restricted fee.

Plaintiff cites the "Morrin Letter" from the Bureau of Indian Affairs interpreting the phrase "held as Indian Lands are held" as ambiguously allowing land acquired using trust funds to be held in trust, restricted fee, or fee simple.  Pl. Br. at 11-12.  Plaintiff also cites the Seneca Indian Land Claims Settlement Act as evidence that Congress could have provided for "restricted fee" land if it so intended.  *Id.*  Neither the Morrin Letter nor any other statute provide a basis for interpreting Congressional intent in MILCSA.[7]  After finally providing a modicum of justice to BMIC after extracting millions of acres of their land for 15 cents an acre, Congress surely did not maintain, over the Department of Interior's objection, the particular phrase finally authorizing BMIC to acquire land pursuant to MILCSA and yet intend that lands acquired thereunder would have no protection against alienation.

Given the historical context and plain language outlining how BMIC may use MILCSA funds, it is absurd to contend that Congress intended for BMIC to be able to freely sell land purchased for the purpose of consolidating and enhancing tribal landholdings.  Adopting the conclusion reached by the Morrin Letter would mean that Congress meant to allow BMIC to purchase land with the MILCSA funds, immediately sell that land to a third party, then use the revenue for any purpose.  It is illogical that Congress would create the statutory framework of a trust fund, trustee, and guidelines for acquisition if Congress contemplated that BMIC could act

---

Indians of Utah Restoration Act, 25 U.S.C. § 766; FELIX S.  COHEN, HANDBOOK OF FEDERAL INDIAN LAW, Ch. 15, §6 at 296-297 (1942 ed.).

7 *Alonzo v. United States*, 249 F.2d 189, 196 (10th Cir. 1957) (where tribal land was purchased subject to Congressional requirements, land held in fee is subject to restriction on alienation.).  This view also is taken by Cohen, Handbook of Federal Indian Law, Ch. 9, § A.1.a (1982 ed.), which states that the phrase "held as Indian lands are held" vests recognized and enforceable property rights in the Tribe.

in such a manner.  More logically, the intent was to establish the parameters for BMIC to acquire property that would not be transferable once acquired.

By enacting §107(a)(3) of MILCSA, Congress has enacted a tribal-specific statute that not only authorizes the acquisition of land but also requires BMIC to use its Land Trust funds solely for tribal land-related purposes.  Under such circumstances acquired land becomes subject to Congressionally imposed restrictions against alienation.[8]

### 2.    IGRA Does Not Restrict Gaming on Restricted Fee Land.

Plaintiff argues that even if BMIC acquires restricted fee lands, Section 2719 of IGRA applies to prohibit gaming on such lands acquired after 1988.  Pl. Br. at 21.  The plain language of Section 2719, however, demonstrates that it applies only to lands held in trust by the Secretary, as it states that "gaming regulated by this Act shall not be conducted on lands acquired by the Secretary **in trust** for the benefit of an Indian tribe after the date of enactment of this Act."  25 U.S.C. § 2719 (emphasis added).[9]

---

[8] Plaintiff contends that the Congressional Budget Office ("CBO") statement that accompanies MILCSA evidences that Congress did not intend for BMIC to hold land in restricted fee status, because otherwise it would have indicated that there would be fiscal impacts or costs to local and state governments and the National Indian Gaming Commission (NIGC) from the land being eligible for gaming.  Pl. Br. at 14.  This nonsensical claim is belied by the CBO report that accompanies the 1994 legislation recognizing Plaintiff as a Tribe and providing for mandatory trust acquisition authority allowing Plaintiff to acquire its land for a casino.  That CBO statement too fails to mention the prospect of costs associated with gaming - on state or local governments or on the NIGC.  H.R. Rep. No. 602-632, as pp 9-10 (1994), BMIC Exhibit M.

[9] When interpreting a statute, the court must first consider the statute's plain language and enforce the statute "according to its terms."  *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).  "If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning."  *United States v. Washington*, 584 F.3d 693 (6th Cir. 2009) (quoting *Caminetti*, 242 U.S. at 490).  The United States Supreme Court has repeatedly emphasized that "a legislature says in a statute what it means and means in a statute what it says there."  Id.  (quoting *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)) (citations and internal quotations omitted).  Under the plain language of the statute, Section 2719 applies only to land held in trust.

13

Not satisfied with the effects of the statutory language as written, Plaintiff wishes to speculate regarding Congress's intent.  In doing so, Plaintiff essentially asks this Court to replace the term "trust lands" in Section 2719 with the IGRA defined term "Indian lands" from Section 2703(4) of the statute.  This definition encompasses "any lands title to which is either **held in trust** by the United States for the benefit of any Indian tribe or individual **or** held by any Indian tribe or individual **subject to restriction** by the United States against alienation…"  25 U.S.C. § 2703 (emphasis added).  This definition includes different meanings for lands held in trust and restricted fee lands, and thus, the term Indian lands is not synonymous with lands held in trust.  Had Congress meant to apply Section 2719 to both trust and restricted fee lands, Congress could have simply used the defined term "Indian lands" in Section 2719.

While Plaintiff is correct that Interior and the NIGC at one point took the position that Congress must have meant to apply Section 2719 to restricted fee lands, when Interior later engaged in a formal, reasoned analysis, Interior and the NIGC, determined that Section 2719 applies only to trust lands – exactly as it is written.

The Department of Interior first engaged in in-depth meaningful analysis of Section 2719 in its development of formal regulations governing gaming on after-acquired trust lands and implementing the Section.[10]  At the conclusion of lengthy notice and comment rulemaking, replete with multiple public hearings, Interior concluded that Congress **purposefully** omitted the

---

[10] This analysis also brings into play another related Indian canon of construction that the Indian canons of construction overcome the rule of deference to an administrative agency's interpretation of a statute that it administers (the so-called Chevron rule).  That related canon has been applied to cases in which Indian litigants' interpretation of a statute is at odds with that of the Department of the Interior.  See, e.g., *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney*, 369 F.3d 960, 971 (6th Cir. 2004); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991).  This Court has recently followed the Indian canon in *Sault Ste. Marie Tribe v. U.S.*, 576 F. Supp. 2d 838 (W.D. Mich. 2008).  The circumstances of this case present another occasion in which interpretation of a statute expressly and solely designed to assist Indian people and their Tribes should be carried out so that the statute's purpose can be effected.

term restricted fee from Section 2719.  73 Fed. Reg. 29,355–56 (May 20, 2008).  As explained

by Interior, Congress evidenced this intent by referring to restricted fee lands in other sections in

IGRA, including in Sections 2719(a)(2)(A)(ii) and 2703(4)(B).  *Id.*

 Following the implementation of the Part 292 regulations, then-Solicitor Bernhardt issued

a memorandum opinion further explaining that Section 2719 does not apply to restricted fee

lands.  *See* Memorandum Opinion M-37023 re: Applicability of 25 U.S.C. § 2719 to Restricted

Fee Lands (Jan. 18, 2009).  Unlike the prior letter from the Secretary to the Seneca Nation upon

which Plaintiff relies or, for that matter, the opinion of the Solicitor concerning the ability of

BMIC to conduct gaming at Vanderbilt, a Solicitor "M Opinion" is a published decision entitled

to significant deference.  As such, it is exactly the type of considered analysis Plaintiff asserts is

necessary to overturn the Department's prior informal interpretation of Section 2719.

 In M Opinion M-37023, the Solicitor, emphasizing the differences between lands held in

trust and restricted fee lands, explained that the Department had concluded that the language of

Section 2719 is clear and cannot be ignored for several reasons.  Plaintiff's Exhibit 9 at 5.  The

NIGC expressly agreed that this conclusion "adheres to the explicit language of the statute"

because Section 2719 "only references trust land acquired after October 17, 1988.  It says

nothing of land held by a tribe subject to restriction by the United States against alienation."

Plaintiff's Exhibit 16 at 11.  Pointing to the Department's differing definitions of trust and

restricted land in 25 C.F.R. Part 151 and federal statutes distinguishing between trust and

restricted lands, NIGC concluded that "'in trust' is a term of art that has a specific meaning with

the realm of federal Indian law."  *Id.* at 17.  NIGC concluded that based on "Congress' history of

enacting legislation pertaining to trust and restricted land, it is evident that Congress in this

context understood that the two types of Indian lands are not the same and intended to use the

term 'in trust' accordingly. . . . [Conversely the] use of the term *restricted* in some provisions of IGRA and not in [2719(a)] evinces Congressional intent to exclude it from the general prohibition." *Id.* at 17-18.

If Congress had intended to include restricted fee lands in its prohibition on gaming on after-acquired lands in Section 2719, it would have done so. By its terms, Section 2719 applies only to lands held in trust. The Vanderbilt Tract is not held in trust. Rather, it is "restricted fee" land as that term is defined in Section 2703. Thus, Section 2719 does not apply to BMIC's operation of the Vanderbilt Casino.

### b.   The Vanderbilt Parcel Was Acquired Pursuant to MILCSA.

Next, Plaintiff turns to BMIC's specific acquisition of land in Vanderbilt and asks this Court to twist federal law in a manner that potentially would serve Plaintiff's interest, but that is entirely inconsistent with the plain language of the statute as well as bedrock principles of statutory construction. When further examined in the historical context that lead Congress to pass MILCSA, as well as in light of the Indian canons of construction, which require this Court to construe the statute in BMIC's favor, Plaintiff's arguments must fail.

### 1.   BMIC Acquired the Vanderbilt Parcel Using MILCSA Trust Funds.

As discussed above, MILCSA provides that "[t]he earnings generated by the Land Trust shall be used exclusively for improvements on tribal land or the consolidation and enhancement of tribal landholdings through purchase or exchange." Pub. L. 105-143, § 107(a)(3). The Executive Council serves as the trustee of the Land Trust and is required to administer the Land Trust in accordance with MILCSA Section 107.[11] Pub. L. 105-143, § 107(a)(2). Pursuant to

---

[11] Such exercise of discretion is judicially reviewable only for abuse. Restatement (Third) of Trusts § 80 (2007). The court applies "a general standard of reasonableness," taking into account other terms and purposes of the trust. *See* Restatement (Third) of Trusts § 87 (2007).

16

Congress's direction under MILCSA, the Executive Council, in its discretion, determined that BMIC's acquisition of the Vanderbilt parcel was consistent with the direction that the Land Trust as a whole be used to consolidate and enhance BMIC's landholdings.  As such, BMIC utilized funds available in the Land Trust to acquire the Vanderbilt Parcel.  BMIC Exhibit L.

> **2.**     **Congress Intended a Broad Grant of Authority for BMIC to Use Trust Funds to Acquire Landholdings to Benefit the Tribe.**

Despite the power granted to BMIC's Executive Council, Plaintiff argues that Section 107 mandates that each <u>purchase</u> BMIC makes using Land Trust funds must simultaneously both consolidate and enhance BMIC's landholdings, rejecting any alternative interpretation that it is the Land Trust's acquisitions as a whole that must effectuate these dual goals.

MILCSA does not define the terms "consolidation" or "enhancement," and Plaintiff now encourages this Court to apply the most restrictive meaning possible to read into that provision a requirement that consolidation necessarily means geographic consolidation such that only a consolidation that unites contiguous parcels as one parcel would be permitted.  Such an

---

The Uniform Trust Code § 814(a) states that: "the trustee shall exercise a discretionary power in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries."  Restatement (Third) of Trusts § 86 (2007).

The legislative history surrounding the passage of the MILCSA demonstrates the evolution of the trustee concept as it developed into legislation.  Through the process, Congress gave increasing latitude to the Executive Council, demonstrating the intent to provide the Trustee and the Tribe increased flexibility in utilizing MILCSA funds in the Tribe's best interest.  A subsection in an unintroduced early 1996 draft by BMIC, for example, would have given the Secretary of the Interior authority to enforce the terms of MILCSA Section 107(a)(3) after notice and a hearing if the Executive Council materially failed to administer it in accordance with the terms of the statute.  This language was not included in the first actual bill, thereby avoiding Interior oversight over the Executive Council.  BMIC Exhibit N.  This demonstrates an intent to give more flexibility to the Executive Council in administering the trust.  The Executive Council's expenditures to achieve improvements, consolidation, and enhancement were originally written to occur annually, but this language was also deleted to allow the Executive Council greater discretion in choosing the timing of its purchases.

interpretation is not warranted by the statute's plain language or the underlying purpose of MILCSA, which allows the Trustee discretion to use the trust funds for the benefit of the Tribe.

First, a more appropriate interpretation is that Congress did not intend to restrict BMIC's ability to use trust funds to acquire only property that is physically contiguous—doing so would place a contradictory limit on BMIC's ability to fulfill the statutory purpose of acquiring property for the Tribe's benefit.  The more logical conclusion is that Congress instead intended "consolidation" to mean to combine multiple parcels (whether contiguous or non-contiguous) under BMIC's ownership as long as the trustee deemed such ownership to be beneficial.  Given that MILCSA Section 107(a)(3) does not expressly limit BMIC's use of Land Trust proceeds as Plaintiff claims, it is appropriate to look to the Indian canon of statutory construction for guidance.  When construed liberally in favor of BMIC as required by the Indian canon of construction, this Court must conclude that Congress did not intend MILCSA Section 107 to implicitly restrict BMIC's ability to acquire land to improve, consolidate, and enhance BMIC's landholdings such that any such acquisition is required to be geographically contiguous.

Second, Plaintiff argues in favor of construing Section 107(a)(3) to impose significant restrictions on BMIC based on the use of the term "and" in the phrase "the consolidation and enhancement of tribal land" conjunctively.  Pl.'s Br. 9–10.  According to Plaintiff, such use of the conjunctive "and" requires that <u>every</u> parcel BMIC purchases with Land Trust proceeds must both consolidate and enhance tribal land.  *Id.*  Such an interpretation contorts Congress's intent in adopting MILCSA and also is inconsistent with basic principles of statutory construction which make clear that a court may read "and" as "or," or "or" as "and."  *See United States v. Moore*, 613 F.2d 1029, 1040 n.86 (D.C. Cir. 1979); *De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956).  Courts do not apply the ordinary meanings of "and" and "or" "inexorabl[y], for

sometimes a strict grammatical construction will frustrate evident legislative intent." *Moore*, 613 F.2d at 1040. The legislative history reflects a meaning of enhancement that includes the acquisition of new lands. During the development of the legislation, Interior asked Congress to clarify whether "enhancement" includes improvements on land, or only the acquisition of new land. Plaintiff's Exhibit 11 at 3. The language was changed to add a separate phrase for improvements, rather than a modification of the term enhancement. This clarification demonstrates that enhancement means the acquisition of new land. Plaintiff's interpretation renders the word "enhancement" nugatory because the same sentence already uses the word "improvement." Principles of statutory construction demand that Congress must have intended the alternate meaning of enhancement – "to increase." [12]

Here, the Executive Council has used and continues to exercise discretion in utilizing Land Trust as a whole to for the consolidation and enhancement of BMIC's landholdings. Nothing requires MILCSA to be read in a fashion to require each and every individual property acquisition using trust funds to simultaneously accomplish both purposes. Because the funds currently are being used to consolidate and enhance BMIC's real estate portfolio through a variety of purchases, the trustee is satisfying MILCSA's requirements in this regard and has exercised its discretion reasonably. As the purpose of this statute is to benefit the tribe, the trustee's use of Land Trust funds in this manner is both reasonable and consistent with Congress' intent to help the tribe.

---

[12] Although not at issue in Plaintiff's Brief, the dictionary defines "enhance" as "1. raise 2. to add or contribute to: as a: improve b. increase." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 413 (9th ed. 1983). By using the word "enhancement," it appears Congress intended to encourage the tribe to both improve currently held land and to increase the quantity of land held through property acquisition by utilizing the ordinary, dictionary definitions of consolidate and enhance.

### c.     BMIC has Jurisdiction and Exercises Governmental Authority.

#### 1.     BMIC Has Jurisdiction.

Because BMIC exercises governmental power over its restricted fee lands in Vanderbilt, these lands are "Indian lands" pursuant to Section 2703(4)(B) of IGRA.  In order to exercise governmental power an Indian tribe must first have jurisdiction to do so.  *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419 (D. Kan. 1996).  Such jurisdiction is presumed when the lands are "Indian Country."  *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998).

To determine whether land is "Indian Country," courts review:  (1) whether Congress has indicated that the land has been set aside for the use and occupancy of the Indians, and 2) whether the land is under federal superintendence, which standards were just as those requirements had been for a finding of Indian country before 18 U.S.C. § 1151 was enacted. *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 528 (1998).[13]

Plaintiff analogizes the present case with *Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073 (10th Cir. 1993) and suggests that BMIC's efforts to effectuate the aims of MILCSA are similar to those of the individual smoke-shop owners operating on lands acquired pursuant to the United Keetoowah Band of Cherokee Indians' tribal charter.  The status of land ownership is not, however, preclusive of the character of the land as Indian lands and is the fundamental justification for the need for the expansive Indian country definition of 18 U.S.C. §1151.[14]

---

[13]In the present case, BMIC's restricted fee lands are most akin to the concept of a dependent Indian community as articulated in *United States v.  Sandoval*, 231 U.S. 28 (1913).

[14]*United States v.  Sandoval*, 231 U.S. 28 (1913) (holding communally-held fee lands are Indian country); *United States v.  Pelican*, 232 U.S. 442 (1914) (holding an individual allotment is Indian country); *United States v.  McGowan*, 302 U.S. 535 (1938) (holding trust lands are Indian country).See also, *Indian Country U.S.A., Inc. v.  State of Oklahoma*, 829 F.2d 967 (10th Cir. 1987).

Further, in *Sandoval*, the Court found that Congressional legislation which prohibited taxing a tribe's lands and personal property clearly indicated that those lands were set apart for the tribe and that Congress intended federal superintendence. *United States v. Sandoval*, 231 U.S. 28, 40 (1913). Similarly, here Congress passed MILCSA "in the exercise of the Government's guardianship over th[e] [Indian] tribes and their affairs," *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 528 (1998), *quoting* Sandoval. at 48.

Although lands purchased pursuant to MILCSA are not lands owned by the United States, they also meet the test of *Venetie* because the phrase "as Indian lands are held" demonstrates Congress' intent to set aside and protect them with the force of the federal government as guardian of BMIC's lands.[15] Accordingly, restricted fee land purchased pursuant to MILCSA is "set apart for the use of the Indians as Indian land." *See, e.g., Venetie*, 522 U.S. at 529 (quoting *United States v. McGowan*, 302 U.S. 535, 539 (1938)).

This is unlike the authority relied on by the Plaintiff in *Buzzard* because the restriction on alienation for lands purchased in that case was derived from a tribal charter which provided that the Tribe could not sell its land without Secretarial approval. *Id.* at 1075. Because Congress had no role concerning the land purchases in that case, Plaintiff's assertion that *Buzzard* applies to a case in which Congress played a central role in the land purchase through MILCSA is erroneous.[16]

---

[15]Lands that are held as "Indian lands" are often synonymous with "Indian country." *See e.g., Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 520 (1998) (a dependent Indian community is one category of "Indian lands")

[16]In further response to Plaintiff's mischaracterization in this regard, it must be recognized that because the Indian Trade and Intercourse Act applies with full force to the Vanderbilt property, that prohibition against transfer **is** a veto on any unauthorized transfer. The Indian Trade and Intercourse Act, 25 U.S.C. §177, precludes any entity from alienating title to Indian lands absent express Congressional approval, stating "[N]o purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered

As such, because the Vanderbilt parcel was validly purchased with Land Trust funds, and, therefore became subjected to the proscriptions of the Indian Trade and Intercourse Act—a clear exercise by the federal government of its guardianship role and superintendence over the BMIC Vanderbilt parcel—BMIC clearly possesses jurisdiction over it.

### 2. BMIC Exercises Governmental Authority.

In addition to having jurisdiction over the Vanderbilt parcel, the Tribe also presently exercises its governmental power, a necessary component of a finding that governmental power exists for purposes of IGRA. *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994). Though there is no uniform guidance as to what constitutes the present-day exercise of such power, courts have considered such review as a case-by-case analysis. *See, National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act*, 57 Fed. Reg. 12382 (1992). Courts have looked to such factors as, the establishment of governmental services, such as a tribal housing authority, administration of health care programs, job training, public safety, conservation and other governmental programs. *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994). Other factors considered include: whether the parcel is developed, and whether law enforcement is provided by the tribe or the

---

into pursuant to the constitution." The Act of June 30, 1834, 4 Stat. 729, 730, 25 U.S.C. § 177. Similarly, the Regulations promulgated by the Bureau of Indian Affairs state that:

> Lands held in trust by the United States for an Indian tribe, lands owned by a tribe with Federal restrictions against alienation and **any other land owned by an Indian tribe may only be conveyed where specific statutory authority exists and then only with the approval of the Secretary** unless the Act of Congress authorizing sale provides that approval is unnecessary.

25 C.F.R. 152.22 (emphasis added).

state as well as other indicia.  *Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F. Supp. 523, 528 (D.S.D. 1993), aff'd, 3 F.3d 273 (8th Cir. 1993).

Here, BMIC has made significant developments on the property, including a fully-functioning, tribally owned gaming facility.  Pl.'s Br. 1.  This facility has been licensed by the Bay Mills Tribal Gaming Commission.  BMIC Exhibit K.  Furthermore, BMIC's law enforcement authority is recognized by the Otsego County Sheriff.  *See* Law Enforcement Agreement between the Bay Mills Indian Community and Otsego County Sheriff's Office, effective 12/13/10, BMIC Exhibit O.  Thus, law enforcement on this parcel is purely tribal in nature.  Additional discussions concerning a delineation and recognition of BMIC's civil regulatory authority are also currently underway.  *See*, Decl. of John Burt, BMIC Exhibit P. Finally, BMIC's existing laws apply to the Vanderbilt parcel with full force and effect.  *See*, Constitution and Bylaws of the Bay Mills Indian Community, Article II-Territory, Section 1, BMIC Exhibit Q.

Because BMIC can demonstrate comprehensive, regulatory control, both civilly and criminally, BMIC has demonstrated that it exercises governmental control over the Vanderbilt property.  Accordingly, because BMIC has established this governmental power as well as its jurisdiction over its restricted fee property in Vanderbilt, the Vanderbilt property is "Indian lands" as defined by IGRA Section 2703(4)(B).

**B.      Plaintiff Cannot Demonstrate Irreparable Injury.**

The court must consider the following factors in evaluating allegations of irreparable injury:  the substantiality of the alleged harm, the likelihood of its occurrence, and the adequacy of the proof provided by the movant.  *Mercy Health Servs. v. 1199 Health & Human Serv. Employees Union*, 888 F. Supp. 828, 838 (W.D. Mich. 1995).  Additionally, the movant must show irreparable harm that is "both certain and immediate, rather than **speculative** or

**theoretical**" to satisfy its burden to receive preliminary injunctive relief.  *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (emphasis added).  To prove that irreparable injury is likely to occur, a movant must provide evidence that the harm has occurred in the past and is likely to occur again.  *Id.*  Plaintiff did not address these factors in its brief.  When, as here, irreparable injury to plaintiff is not proven, relief must be denied.  *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982).

> **i.    Plaintiff Fails to Demonstrate Irreparable Harm as a Matter of Law.**

Plaintiff must establish not just that an injury may occur, but that one <u>has</u> occurred and that additional injury is "certain and immediate."  Although BMIC's Vanderbilt facility was open for seven full weeks before Plaintiff filed this action and motion, Plaintiff has submitted <u>no</u> evidence of any harm to its operations.  Conversely, in demonstration of its economic health and lack of harm, on November 30, 2010, three weeks <u>after</u> Vanderbilt opened, Plaintiff's Chairman announced that a financial restructuring that reduced Plaintiff's debt load from $143 million to $40 million had ensured that Plaintiff would have the necessary resources to support its needs. See Decl. of Jacob Miklojcik, BMIC Exhibit R, ¶20, and Exhibit B thereto.

Given Plaintiff's inability to point to ongoing, certain or immediate harm, Plaintiff instead relies on a mishmash of potential harms, with wild claims that it will lose half or more of its market share purportedly supported by an expert report founded on the unprovable (and inaccurate) assumption that BMIC's Vanderbilt facility will rapidly expand without constraint. As explained *infra*, even apart from its failure to analyze the Vanderbilt casino based on a facility limited to 84 slot machines, Plaintiff's expert report is seriously flawed and does not establish that the speculative harm to profits or market share that it posits is likely to occur.

Plaintiff also claims that it will suffer a loss of goodwill and harm to its reputation.  Pl.'s Br. 23.  Although loss of customers and goodwill may serve as a basis for finding irreparable

harm in certain circumstances, "such harm is often too **speculative** or insubstantial to justify preliminary injunctive relief." *Michigan Bell Tel. Co. v. MFS Intelenet of Michigan Inc.*, 16 F. Supp. 2d 828, 832 (W.D. Mich. 1998) (emphasis added). BMIC has done nothing that would harm Plaintiff's reputation and has not made any defamatory remarks or misrepresentations about the Odawa Casino Resort. Only in such circumstances could the Vanderbilt Casino be damaging to the Odawa Casino Resort's reputation. (*See Hoover Transp. Serv. Inc., v. Frye*, 77 Fed. Appx. 776 (6th Cir. 2003); *See Mercy*, 888 F. Supp. at 838.)

Finally, claims of "illegal" competition do not constitute irreparable harm. In the *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney*, the federal and state governments sought to declare the Grand Traverse Band of Ottawa and Chippewa Indians' gaming facility illegal and enjoin further gaming there. 46 F. Supp. 2d 689, 691 (W.D. Mich. 1999). The governments argued that the Tribe violated IGRA in opening its casino, and only needed to show a violation of that law for an injunction to issue. *Id.* at 692, 704. The Court stated that "an injunction is not required to issue simply because the action is alleged to be statutorily prohibited." *Id.* at 704. Thus, the governments failed to prove a sufficiently irreparable harm to warrant granting an injunction. *Id.* at 705.

### ii.   Plaintiff Has Failed to Demonstrate Facts that Establish Irreparable Harm.

BMIC's Vanderbilt casino currently houses 38 slot machines, with an expansion later this week to take it to 84 machines. Decl. of Jeffrey Parker, BMIC Exhibit E, ¶4. BMIC neither has the intention nor the present capacity to embark on any further significant expansion of the Vanderbilt casino—in fact, BMIC chose the number of 84 machines quite consciously. *Id.* at ¶4-6. This number of machines, 84, is one below the threshold of what Plaintiff's own compact with the State of Michigan defines as a "commercial casino" sufficient to have an impact on Plaintiff's operations. BMIC Exhibit R, ¶22. And even if BMIC did expand its facility to 85

machines, Plaintiff cannot establish harm, as it would then be able to cease making revenue sharing payments to the State of Michigan.

Plaintiff's expert report is flawed in large part because it fails to appreciate or account for the size of BMIC's Vanderbilt Casino, does not account for the fact that an expanded facility could provide Plaintiff relief from its payment obligations to the State, and simply assumes, without basis, that the Vanderbilt Casino could expand to a size equal to Plaintiff's Odawa casino in this very same year. As explained in much greater detail in the declaration of Jacob Miklojcik, the pre-eminent expert on Michigan's gaming market, Plaintiff's Alea Report also suffers from other severe analytical and methodological flaws. See BMIC Exhibit R. Most critically, it ignores the attractiveness of Petoskey as a market and the fundamental differences between the Petoskey resort community and the Village of Vanderbilt. *Id.* It uses geographic radii that appear selected for no other reason than to overstate the possible impacts of Vanderbilt. *Id.* The Alea Report also mistakenly assumes, based solely on Vanderbilt's location on I-75, that 100% of Odawa's identified southern Michigan patrons will cease gaming at Odawa in favor of Vanderbilt. *Id.* he Alea Report also ignores the fact that there is latent gaming demand in Michigan. *Id.*

Finally, Plaintiff baldly asserts that competition with the Vanderbilt Casino will cause it to lay off tribal members, increasing the demand for tribal government resources at the same time that funding for those resources is being diminished. Pl.'s Br. 26–28. Plaintiff has only tenuously connected the possibility of layoffs, and program cuts, to the Vanderbilt Casino and has not proven that any such harms would not be due to other factors such as the down Michigan economy. Indeed, some three weeks after Vanderbilt opened, and after Plaintiff had ample time to (and did) object to this facility, Plaintiff closed a restructuring of its debt under which it shed

$143 million in debt.  BMIC Exhibit R, ¶20.  At that time, Plaintiff's Chairman announced that the transaction meant that the Tribe was assured of having the necessary resources to support its needs.  *Id.*  Plaintiff's claims of harm to tribal services and employment are not only too speculative to constitute irreparable injury, but are belied by statements from Plaintiff's elected leadership.

Plaintiff's claimed potential injuries are not certain and immediate enough to meet the standard for irreparable injury.  Also, the likelihood of a substantial impact occurring is low, given that the Vanderbilt Casino has spacial constraints and, even after an expansion is completed this week, will be operating with less than the 85 machines Plaintiff designated as the threshold for a competitive facility.  BMIC Exhibit E, ¶4-6.  Plaintiff's one report in support of potential injuries is wildly speculative and flawed, and Plaintiff offered no evidence to prove that injury has occurred in the past and is attributable to Vanderbilt Casino's opening.  Thus, Plaintiff has not met the requisite irreparable injury standard.

**C.     BMIC, Its Members, And Casino Employees Will Suffer Irreparable Harm If An Unwarranted Injunction Is Issued.**

If the Court finds that the remaining factors have been met, this Court may enjoin the operation of the Vanderbilt casino only if Plaintiff proves that the harm to Plaintiff from failure to grant an injunction exceeds the harm to BMIC from granting it.  *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545–46 (1987).  Plaintiff has not demonstrated with any certainty that any injury will occur to them without an injunction and certainly has not demonstrated that harm Plaintiff may hypothetically suffer outweighs the harm caused by certain job loss and lost revenue that will result immediately upon the issuance of an injunction.

This case typifies why caution is paramount in addressing injunctions, according to the Sixth Circuit in *Detroit Newspaper Publishers Association v. Detroit Typographical Union No.*

*18, International Typographical Union*, 471 F.2d 872 (6th Cir. 1972), quoting Professor Wright's <u>Federal Practice and Procedure</u>, "There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction." *Id*. at 876.

It cannot be disputed that a preliminary injunction would immediately result in lost revenue for BMIC and a negative impact on the Vanderbilt community, where the casino is providing jobs and benefiting local business and government. *See* Decl. Of Ferdinand Gorny, BMIC Exhibit S; Decl. of Hugo Noeske, BMIC Exhibit T; Decl. of Debbie Whitman, BMIC Exhibit U.

Plaintiff argues that BMIC cannot suffer harm from an "illegal" casino. This allegation again turns on the merits of this case. Although Plaintiff does not like it, the Vanderbilt casino is operating pursuant to IGRA and the Bay Mills Compact. As such, there is no actual statutory violation – and in any event, a potential violation may not be sufficient to permit the issuance of an injunction. *See Grand Traverse Band*, 46 F. Supp. 2d at 704.[17] Boiled down, this simply is a case of one casino trying to block a perceived competitor from entering the market.

Like all equitable remedies, a preliminary injunction will not issue unless the right to relief is clear. In determining whether to issue a preliminary injunction, the Court is not required to resolve 'doubtful questions of law or disputed questions of fact.'" *Barber ex rel. Barber v. Dearborn Public Schools*, 286 F. Supp. 2d 847, 852 (E.D. Mich. 2003). As Professor Wright explained, there is no power more dangerous in a doubtful case than the issuance of an injunction. Given the weight of authority contrary to Plaintiff's argument, it may be an

---

[17] Plaintiff also makes a vague reference to other Indian tribes being hurt by a reputational injury to Indian gaming. Pl.'s Br. 28. It does not allege any harm to the reputation of any particular tribe. This alleged injury is too speculative for injunctive relief, as it does not involve a specific tribe and Plaintiff fails to provide any evidence to support this assertion.

understatement that Plaintiff's case is "doubtful."  In light of the immediate harm that BMIC, its members, the Vanderbilt community, and casino employees would suffer upon the issuance of an injunction, this Court should reserve the extreme remedy of injunctive relief and require Plaintiff to prove its case rather than simply eliminating the potential competition.

**D.    The Public Interest Would Be Harmed By An Injunction.**

The public interest would be harmed by an injunction forcing the Vanderbilt casino to close.  The casino has brought job opportunities to a struggling region of the state.  No evidence has been submitted that the jobs created in Vanderbilt were lost by Plaintiff and it appears these are new jobs for the State of Michigan.

Additionally, it is a federal interest to promote tribal self-sufficiency and self-government.  *See Grand Traverse Band*, 46 F. Supp. 2d at 705.  The tribe's decision to open a casino and use revenues from the Vanderbilt casino to provide for the tribe and its members accomplishes these goals.  The Vanderbilt casino is supported by local officials pleased that it has brought employment opportunities to local residents and improved access to essential government services.  *See* BMIC Exhibits S-U.  It has had a positive effect on the small Vanderbilt community by increasing patronage to other local businesses, including restaurants and gas stations.  *Id.*  Because casino gaming is widespread in Michigan, concerns about the continued operation of another casino do not implicate the public welfare.  *See Grand Traverse Band*, 46 F. Supp. 2d at 705.

Although Plaintiff is correct in asserting that it is in the public interest to enforce the law, its claim that BMIC is operating Vanderbilt Casino in violation of the law turns on the merits of this case.  *See Grand Traverse Band,* 46 F. Supp. 2d at 705.  A court is not required to grant an injunction simply because a plaintiff alleges a defendant violated IGRA.  *See Keweenaw Bay Indian Cmty v. United States*, 1999 WL 33978509 *1, *3 (W.D. Mich.) ("Although particular

regard should be given to the public interest, '[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law.[']") (quoting *Amoco*, 480 U.S. at 542).

Finally, Plaintiff is incorrect in asserting that the state will lose revenue from Plaintiff in the form of exclusivity payments to the state to keep competition out of a "Competitive Market Area," as described in Plaintiff's gaming compact. Because Vanderbilt Casino only will operate 84 machines, it is below the 85 machine exclusivity provision in Plaintiff's Tribal-State Compact. *See* BMIC Exhibit R, ¶22, and Exhibit C thereto. Plaintiff, therefore, may not avoid making exclusivity payments to the state, and the State's revenue will not be affected by the operation of the Vanderbilt casino.

The Vanderbilt casino creates jobs, raises revenue for Vanderbilt, helps BMIC and its members and causes little or no demonstrable harm. By any measure, the Vanderbilt casino's benefits far outweighs any actual or potential harm. As such, the public interest weighs against issuing an injunction.

## V.        CONCLUSION

Plaintiff has failed to present evidence satisfying the factors necessary for injunctive or declaratory relief. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 773. Plaintiff's motion should be denied.

Respectfully submitted,


By: */s/Chad P. DePetro*
Chad P. DePetro (P58482)
Attorney for Defendant
Bay Mills Indian Community
12140 W. Lakeshore Drive
Brimley, Michigan 49715
Telephone:  (906) 248-3241
Facsimile:  (906) 248-3283
Date: January 19, 2011        Email:  cdepetro@bmic.net

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.  I hereby certify that I have mailed by United States Postal Service the same to any non-ECF participants.


By: */s/ Chad P. DePetro*
     Chad P. DePetro (P58482)
     Attorney for Defendant
     Bay Mills Indian Community
     12140 W. Lakeshore Drive
     Brimley, Michigan 49715
     Telephone:  (906) 248-3241
     Facsimile:  (906) 248-3283
     Email:  cdepetro@bmic.net